NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THOMAZ GRUBER,

                              Plaintiff,

            v.

SABERT CORPORATION,

                              Defendant.

Civil Action No. 21-13312 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Sabert Corporation's ("Defendant" or "Sabert") Motion for Summary Judgment. (ECF No. 115.) Plaintiff Thomaz Gruber ("Plaintiff" or "Gruber") opposed (ECF No. 122), and Defendant replied (ECF No. 125). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Defendant's motion is granted.

I.      **BACKGROUND**

The Court recites only the uncontested facts necessary to contextualize the present motion.

A.      **Factual Background**

        1.      ***Plaintiff's Employment with Defendant***

Sabert is "a manufacturer of innovative food packaging products and solutions, founded in 1983 by Albert Salama" ("Salama"). (Def.'s Statement of Facts ("DSOF") ¶ 1, ECF No. 117; Pl.'s Response to Def.'s Statement of Facts ("PRSOF") ¶ 1, ECF No. 124.) On October 30, 2017, Gruber, an individual who received his M.B.A. from Cornell University and speaks three languages fluently, began employment with Sabert as the Senior Vice President of Operations and

Supply Chain. (DSOF ¶¶ 1, 3, 4; PRSOF ¶¶ 1, 3, 4.) Gruber reported directly to Sabert's CEO, Salama, who initially hired him. (DSOF ¶¶ 3, 5; PRSOF ¶¶ 3, 5.) Gruber's responsibilities in his role included managing the: (1) procurement of materials used to make Sabert's packaging products; (2) purchase and operation of the machines used to make Sabert's packaging products; (3) operation of the manufacturing facilities; (4) warehouse and distribution operations; and (5) personnel working on those aspects of the operations.[1] (DSOF ¶ 6; PRSOF ¶ 6.)

In Gruber's March 2020 annual review, Salama outlined for Gruber the areas which were to be his main priorities for the next year.[2] (DSOF ¶ 7; PRSOF ¶ 7.) In advance of the meeting, Gruber emailed Salama with his recommendations for "What to Achieve in 2020." (DSOF ¶ 10 (citing Ex. C to Salama Decl., ECF No. 119-3); PRSOF ¶ 10.) The priorities discussed during the meeting, which were thereafter discussed in an e-mail communication from Salama to Gruber, included: (1) addressing plant safety, including reducing safety incidents in Sabert facilities; (2) completing construction and fabrication of a new Texas-based Pulp Plant; (3) reducing tooling costs associated with the Advance Technology Center (the "ATC"); (4) implementing an initiative to increase machine reliability practices; (5) driving down costs; (6) implementing recommendations from a KPMG study on supply chain and network analysis to cut costs; and (7) increasing factory automation. (DSOF ¶¶ 8, 9 (citing Ex. B to Salama Decl., ECF No. 119-2); PRSOF ¶¶ 8, 9.) On June 22, 2020, Salama sent Gruber e-mail correspondence reiterating the points of priority and identifying other "day to day" duties for Gruber, which included at least:

---

[1] According to Plaintiff, Sabert only had plastics plants when Gruber was initially hired, but Grubert's additional responsibilities were added when Sabert later acquired four paper plants in December 2019. (PRSOF ¶ 6.)

[2] Plaintiff raises that his annual review took place before "the Covid-19 pandemic severely affected the financial results of Sabert due to [a] significant reduction of demand for the most profitable products . . . ." (PRSOF ¶ 8.)

(1) disposal of unused equipment; (2) enhanced product development activity through Sabert's Centers for Innovation (the "CFI"); and (3) paper profitability. (DSOF ¶ 11 (citing Ex. D to Salama Decl., ECF No. 119-4); PRSOF ¶ 11.)

Gruber was tasked with overseeing the safety programs across Sabert's manufacturing facilities and plants, but himself failed to complete Sabert's Safety Training by the July 9, 2020, deadline. (DSOF ¶ 13 (citing Ex. E to Salama Decl., ECF No. 119-5; Exs. F, H to Israel Decl., ECF Nos. 118-6, 118-8); PRSOF ¶ 13 (citing Gruber Decl. ¶¶ 35, 36, ECF No. 123).) Moreover, in July 2020, as part of a safety initiative and based on concerns about maintaining an adequate safety program, Salama informed Gruber that he should terminate the employment of Omar Lopez ("Lopez"), Sabert's Director of Health, Safety, and Environmental Affairs. (DSOF ¶ 15 (citing Salama Decl. ¶ 7, ECF No. 119; Ex. H to Israel Decl.); PRSOF ¶ 15 (citing Gruber Decl. ¶¶ 28, 29).) On August 7, 2020, an accident occurred in Sabert's Kentucky facility when an employee suffered an amputation of his ring and middle fingers. (DSOF ¶ 16; PRSOF ¶ 16.) Following the incident, on August 16, 2020, Gruber and Salama communicated via e-mail correspondence in which Gruber indicated that he would "talk to Brian [Wheeler ('Wheeler'), the Vice President for Human Resources at Sabert] to look at options to start a search [to find a replacement for Lopez]." (DSOF ¶ 17 (citing Ex. G to Salama Decl., ECF No. 119-7); PRSOF ¶ 17.) Lopez was not terminated until seven months later, during which time there were "multiple severe safety incidents in Sabert's facilities." (DSOF ¶ 18; PRSOF ¶ 18 (denying facts regarding Gruber's promise to terminate immediately but not addressing facts related to the timeline for when Lopez was terminated or existence of additional severe incidents).)

Gruber also had responsibilities related to the ATC. (*See* DSOF ¶¶ 19-20 (mentioning Gruber's responsibilities related to the ATC); PRSOF ¶¶ 19-20 (recognizing that Gruber had

3

responsibilities related to the ATC, but denying he neglected those responsibilities).) One of the purposes of the ATC was to manufacture tools at a reduced cost. (DSOF ¶ 20; PRSOF ¶ 20.) On August 5, 2020, Salama sent e-mail correspondence to Gruber, informing him that the "tooling cost from the ATC w[as] significantly higher" than the tooling costs obtained from other third parties, Sabert Asia, and what Sabert Europe pays to third parties. (DSOF ¶ 21 (quoting Ex. H to Salama Decl., ECF No. 119-8); PRSOF ¶ 21.) Salama asked Gruber "[w]hat caused this disconnect?" (DSOF ¶ 21 (quoting Ex. H to Salama Decl.); PRSOF ¶ 21.) On August 7, 2020, Gruber sent e-mail correspondence, noting that "[w]e have not yet developed [the] master tool in order to make th[e] cheap alternative." (DSOF ¶ 22; PRSOF ¶ 22; Ex. I to Salama Decl., ECF No. 119-9.)

In September 2020, Salama reduced Gruber's responsibilities so that Gruber could focus on executing other initiatives assigned to him.[3] (DSOF ¶ 23; PRSOF ¶ 23 (denying Gruber had ongoing failures to attend to his duties but not denying that his duties were otherwise reduced in September 2020).) In an effort to reduce Gruber's responsibilities, Salama personally took over responsibilities for certain initiatives, including the oversight of CFI's product development activity and disposal of unused equipment. (DSOF ¶ 24; PRSOF ¶ 24.) Another employee, Gary Zizniewski ("Zizniewski") was assigned to implement the KMPG study from Gruber. (DSOF ¶ 25; PRSOF ¶ 25 (admitting that "implementation was assigned to . . . Zizniewski").) Gruber, however, remained at least partially responsible for certain initiatives, including: (1) decreasing safety

---

[3] Plaintiff contends that he was "overloaded with responsibilities after . . . Salama in 2019 added CFI and then in 2020 added the [additional] plants," as well as other responsibilities, and "[t]hen in March 2020[,] the impact of the Covid-19 pandemic demanded an enormous amount of time from" Gruber. (PRSOF ¶ 23.)

incidents; (2) completing and making operational the Texas pulp plant; (3) reducing ATC tooling costs; (4) improving automation; and (5) increasing paper profitability. (DSOF ¶ 26; PRSOF ¶ 26.)

One month later, on October 24, 2020, Salama met with Gruber to discuss the initiatives that Gruber remained responsible for. (DSOF ¶ 27; PRSOF ¶ 27.) As part of this meeting, Salama addressed a number of concerns, including: (1) no improvement in safety; (2) losing money on the ATC without "a clear plan to improve [its] profitability"; and (3) paper profitability. (DSOF ¶ 28; PRSOF ¶ 28 (denying statement based on arguments trying to undermine the problems identified but not presenting evidence to suggest these concerns were not discussed); Ex. L to Salama Decl., ECF No. 119-12 (summarizing problems with Gruber's performance identified by Salama in October 2020).)

By January 2021, Salama had additional concerns about initiatives that Gruber was involved in. (DSOF ¶ 31; PRSOF ¶ 31 (denying that Gruber was involved in "ongoing failure to attend to the various initiatives" but admitting that Salama was concerned about delays with the Texas Pulp Plant and profitability of paper plants).) That month, additional safety incidents occurred, including one where an Illinois employee suffered electrical shock due to an exposed live wire and another where a Kentucky employee lacerated his thigh while using a factory-grade "knife." (DSOF ¶ 32; PRSOF ¶ 32 (admitting two incidents occurred).) Although Lopez was finally terminated in February 2021, another incident also occurred in March when an employee had his fingers cut off by a rotor blade. (DSOF ¶ 33; PRSOF ¶ 33.) Additionally, ATC tooling costs had still not decreased, the Texas Pulp Plant initiative had experienced delays, and Sabert's labor costs had increased.[4] (DSOF ¶¶ 34-36; PRSOF ¶¶ 34-36.)

---

[4] Plaintiff claims that the reason for the labor cost increase was the Covid-19 pandemic but does not cite to any evidence in the record to substantiate this contention. (*See* PRSOF ¶ 36.)

### 2.    Termination of Plaintiff's Employment

Given his concerns about Gruber's performance, Salama met with Sabert's Board of Advisors (the "BOA") for months. (DSOF ¶ 37; PRSOF ¶ 37 (denying statement only due to lack of knowledge).) Salama also met with Wheeler to discuss his plan to terminate Gruber's employment.[5] (DSOF ¶ 40; PRSOF ¶ 40.) Ultimately, with the BOA's approval, Salama met with Gruber on May 19, 2021, and terminated Gruber's employment. (DSOF ¶ 38; PRSOF ¶ 38; Wheeler Decl. ¶ 2, ECF No. 120.) The next day, Salama emailed the BOA informing the BOA of the termination and noting that Salama was "unable to rely on him to deliver the needed results whether it is around safety practices, Texas start-up, paper profitability, automation efforts[,] and a needed manufacturing and engineering vision." (DSOF ¶ 39 (quoting Ex. U to Salama Decl., ECF No. 119-21); PRSOF ¶ 39.) Gruber admitted to Wheeler that he was not surprised that Salama terminated him. (DSOF ¶ 42; PRSOF ¶ 42 (stating that "Gruber was not surprised by his termination because he realized that . . . Salama was blaming him for the low profitability of the paperboard business and the delay of the start-up of the Texas Pulp Plant").) Gruber's termination became effective on June 4, 2021. (DSOF ¶ 45 (citing Salama Decl. ¶ 23; Wheeler Decl. ¶ 2); PRSOF ¶ 45.)

Wheeler handled the administrative aspects of Gruber's termination. (DSOF ¶ 48; PRSOF ¶ 48.) As part of this, Wheeler met with Gruber to discuss a separation package that Sabert was prepared to offer and to discuss the next steps for Gruber's exit. (DSOF ¶ 49; PRSOF ¶ 49.) Wheeler advised Gruber that he would receive a payout under Sabert's Transaction Bonus Agreement (the "TBA") in the amount of $198,205. (DSOF ¶ 50; PRSOF ¶ 50.) Gruber's

---

[5] Salama actually met with Wheeler multiple times during the preceding twelve months to discuss his frustration with Gruber's work performance. (DSOF ¶ 41; PRSOF ¶ 41 (noting Gruber has no personal knowledge of the meetings but not denying they happened).)

6

departure was announced publicly within the company using language that Gruber helped draft. (DSOF ¶ 51; PRSOF ¶ 51.)

### 3. *The TBA*

In 2019, Salama began discussing with Wheeler and other Sabert leadership the concept of a TBA in order to "incentivize key leaders to remain employed and work hard to increase Sabert's valuation by offering employees a bonus that would correlate to Sabert's value at the time of [a future sale of Sabert]." (DSOF ¶ 53; PRSOF ¶ 53.) The TBA was created to replace Sabert's then-existing Stock Appreciation Rights ("SAR") Plan which "was effectively a phantom stock plan that provided, among other things, that employees who were employed at the time of a 'change in control' of Sabert would receive a cash payout tied to Sabert's valuation based on company financials from the immediately preceding full fiscal year[.]" (DSOF ¶ 54; PRSOF ¶ 54.) The SAR Plan further provided that "employees who resigned or who were terminated by Sabert for cause, would lose their right to any payout" and that "employees terminated without cause would receive a payout at the time of termination . . . ." (DSOF ¶ 55; PRSOF ¶ 55.) As Sabert's Senior Vice President, Gruber was eligible for and participated in the SAR Plan.[6] (DSOF ¶ 56; PRSOF ¶ 56.)

The TBA was ultimately structured so that: (1) employees who were employed at the time of a transaction would get a payout; and (2) employees who either resigned or were terminated for cause would lose their right to a payout. (DSOF ¶ 59; PRSOF ¶ 59.) In fact, Section 4 of the TBA, entitled "Forfeiture," provided that "[i]f . . . [Gruber's] employment with [Sabert] is terminated for Cause at any time . . . then all rights to the incentive bonus are forfeited." (DSOF ¶ 68 (quoting

---

[6] Gruber represents that his "rights under the SAR Plan never vested, and he never received a payout under the SAR Plan." (PRSOF ¶ 56 (citing Gruber Decl. ¶ 121).)

Ex. F to Wheeler Decl. (the "TBA") § 4, ECF No. 120-6); PRSOF ¶ 68.) For "Cause" is defined to include either "misconduct or neglect of duties." (DSOF ¶ 68 (quoting TBA § 9); PRSOF ¶ 68.)

The TBA was introduced to eligible employees in May 2020. (DSOF ¶ 61; PRSOF ¶ 61.) That month, Gruber met with Wheeler to discuss the TBA program and walked through a PowerPoint Presentation on the TBA program. (DSOF ¶¶ 62, 63; PRSOF ¶¶ 62, 63.) After the meeting, Wheeler emailed Gruber a copy of the presentation and a copy of Gruber's TBA which he was asked to review and sign. (DSOF ¶¶ 65, 66; PRSOF ¶¶ 65, 66.) Gruber returned a signed copy of his TBA on July 25, 2020. (DSOF ¶ 66; PRSOF ¶ 66.)

After Gruber's termination, on May 25, 2021, Wheeler informed Gruber that his "transaction bonus payout" would be processed in that week's pay cycle. (DSOF ¶ 79; PSOF ¶ 79.) On May 27, 2021, Gruber received the payout via direct-deposit in the net amount of $144,204.79, which Gruber subsequently returned to Sabert after commencing litigation. (DSOF ¶ 80; PRSOF ¶ 80.)

## B.    Procedural Background

Plaintiff initially filed suit against Defendant in July 2021, seeking three separate declaratory judgments. (Compl., ECF No. 1.) Defendant moved to dismiss the Complaint (Mot. to Dismiss, ECF No. 4), which the Court granted in part and denied in part (Mem. Op., ECF No. 13; Order, ECF No. 14). In its Opinion, the Court "winnow[ed] Gruber's Complaint to one count of declaratory relief, which will determine whether Sabert can unilaterally buy out Gruber's bonus interest under the [TBA]." (Mem. Op. 10.)

Thereafter, Defendant filed a motion for sanctions for spoliation of evidence. (Mot. for Sanctions, ECF No. 51.) The Court granted Defendant's motion, finding that Plaintiff "spoliated

8

relevant evidence when he incinerated [his work] notebooks in the fire pit at his home."[7] (Mem. Op. & Order on Mot. for Sanctions 9, ECF No. 67.) The Court determined that "Defendant is entitled to an adverse inference at trial based on Plaintiff's spoliation of relevant evidence." (*Id.* at 11.) Plaintiff then filed a motion for reconsideration on the Court's decision to implement sanctions (Pl.'s Mot. for Recons., ECF No. 99), which the Court denied[8] (Mem. Op. & Order on Mot. for Recons., ECF No. 107).

On September 9, 2025, Defendant moved for summary judgment, asking the Court to dismiss Plaintiff's Complaint with prejudice. (*See generally* Def.'s Moving Br., ECF No. 116.) Plaintiff opposed the instant motion (*see generally* Pl.'s Opp'n Br., ECF No. 122), and Defendant replied (*see generally* Def.'s Reply Br., ECF No. 125).

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a)[9] provides that summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). A material fact raises a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248). In deciding a summary judgment motion,

---

[7] During his employment with Sabert, Gruber used spiral bound notebooks to take notes of discussions that took place during meetings. (DSOF ¶ 43; PRSOF ¶ 43.)

[8] Plaintiff claims he later "located three notebooks containing handwritten notes related to his employment while searching for another document." (Mem. Op. & Order on Mot. for Recons. 3.) The Court, however, precluded Plaintiff from introducing those notebooks into evidence. (*Id.* at 14.)

[9] Any reference to "Rule" or "Rules" hereinafter refers to the Federal Rules of Civil Procedure.

a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met its threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the non-moving party fails to come forward with the requisite showing to establish "the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial[,]" then "there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.    DISCUSSION

Defendant moves for summary judgment, arguing that Plaintiff's Complaint against Defendant should be dismissed in its entirety because Plaintiff's "requested declaratory relief [is] either unavailable to Gruber or unnecessary for the Court to consider" for three independent grounds: (1) Gruber's termination was for "Cause" as defined by the TBA, and "thus[,] Gruber is not entitled to a bonus payment of any kind or amount, at any time, under the TBA" ("Ground One"); (2) "[u]nder the express terms of the TBA, . . . Gruber did not timely sign and return to Sabert the TBA, and . . . [thus] the TBA is null and void and . . . not enforceable by Gruber" ("Ground Two"); and (3) even if the Court did not agree with Defendant on Grounds One and Two, "Gruber would be entitled only to a payout at and as of the date of termination based on any then-vested rights under the applicable TBA bonus calculation formula" ("Ground Three"). (Def.'s Moving Br. 25.) Because the Court agrees with Defendant on Ground One that Plaintiff was terminated for "Cause" under the TBA (*see id.* at 26-31), the Court finds that Plaintiff is not entitled to any bonus payment under the TBA and his Complaint should, therefore, be dismissed.[10]

Here, the parties agree that New Jersey law applies. (*See id.* at 27 (noting standard under New Jersey law); Pl.'s Opp'n Br. 31-33 (summarizing applicable New Jersey law).) "Under New Jersey law[,] the construction of a written document is ordinarily a matter of law for the court unless the meaning is uncertain or ambiguous." *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 224 n.6 (3d Cir. 1983) (collecting cases citing New Jersey law). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002)

---

[10] The Court need not reach Defendant's arguments related to Grounds Two or Three.

(quotation marks and citation omitted). "Generally, [however,] the terms of an agreement are to be given their plain and ordinary meaning." *Id.* (citing *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997)). "To assist with this, New Jersey courts often look to general-use dictionaries . . . [a]nd to legal dictionaries[.]" *Centennial Plaza Prop, LLC v. Trane U.S. Inc.*, 771 F. Supp. 3d 481, 489 (D.N.J. 2025) (collecting cases).

As is relevant to the parties' dispute, under Section 4 of the TBA, "[i]f . . . employment with [Sabert] is terminated for Cause at any time, . . . then all rights to the incentive bonus are forfeited and this Agreement shall have no effect from and after the date of such termination. . . ." (TBA § 4.) In the TBA, for "Cause" is defined, among other things, to include "misconduct or neglect of duties[.]" (*Id.* ¶ 9(a).) "Neglect" is defined to mean "to give little attention or respect to." *Neglect*, Merriam Webster, https://www.merriam-webster.com/dictionary/neglect (last visited Apr. 21, 2026); *see also Neglect*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/neglect (last visited Apr. 21, 2026) (defining "neglect" to mean "to not give enough care or attention to people or things that are your responsibility"). Moreover, "duty" (or the plural form "duties") is defined to mean "obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group)." *Duty*, Merriam Webster, https://www.merriam-webster.com/dictionary/duty (last visited Apr. 21, 2026); *see also Duty*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/duty (last visited Apr. 21, 2026) (defining "duty" to mean "something that you have to do because it is part of your job, or something that you feel is the right thing to do").

As Plaintiff recognizes, "[t]he parties agree that . . . Gruber was terminated by Sabert as of June 4, 2021." (Pl.'s Opp'n Br. 11; DSOF ¶ 45; PRSOF ¶ 45.) Plaintiff contends that "[t]he only dispute is whether that termination was 'for Cause' as Sabert now suggests, or without Cause,

12

as . . . Gruber consistently maintained."[11] (Pl.'s Opp'n Br. 11.) As the undisputed facts show, and as Defendant argues, however, "it is clear that Gruber was terminated for reasons that constitute 'neglect of duties' . . . [given] [t]he overwhelming contemporaneous evidence from Salama concerning Gruber's failure to attend to his duties[.]" (Def.'s Moving Br. 27.)

Defendant presented myriad evidence of Gruber's shortcomings in his position. Such undisputed facts of Gruber's performance include, but are not limited to, identified deficiencies of Gruber's performance in connection with: (1) safety initiatives; (2) ATC cost; (3) paper profitability; (4) the Texas Pulp Plant; and (5) factory automation efforts. (DSOF ¶¶ 13, 19, 20, 31-36, 39; PRSOF ¶¶ 13, 19, 20, 31-36, 39.) For example, Gruber was tasked with overseeing Sabert's safety program, but failed to complete the required training by the set deadline himself and did not fire Lopez, the Director of Health, Safety, and Environmental Affairs, until seven months after Salama informed Gruber he should do so. (DSOF ¶¶ 13, 15, 18; PRSOF ¶¶ 13, 15, 18.) During this time, Sabert continued to record serious safety incidents at its facilities. (*See* DSOF ¶¶ 16, 18, 32, 33; PRSOF ¶¶ 16, 18, 32, 33.) Additionally, despite one of the purposes of the ATC being to manufacture tools at a reduced cost (DSOF ¶ 20; PRSOF ¶ 20), Salama noted that the "tooling cost from the ATC w[as] significantly higher" than the tooling costs obtained from other third parties, Sabert Asia, and what Sabert Europe pays to third parties. (DSOF ¶ 21 (quoting Ex. H to Salama Decl.); PRSOF ¶ 21). Gruber even acknowledged this cost issue, noting that "[w]e have not yet developed th[e] master tool in order to make th[e] cheap alternative." (DSOF ¶ 22; PRSOF ¶ 22; Ex. I to Salama Decl.) Moreover, the facts show that the Texas Pulp Plant initiative experienced delays, and Sabert's labor costs had increased. (DSOF ¶¶ 34-36; PRSOF ¶¶ 34-36.)

---

[11] Notably, Plaintiff agrees that "[t]he language of Section 4 of the TBA is clear: if an employee has been terminated 'for Cause,' that employee's rights under the TBA are forfeited." (Pl.'s Opp'n Br. 11.)

Gruber's performance issues were also summarized in contemporaneous documents kept by Salama and Sabert, including: (1) July 9, 2020, e-mail correspondence regarding Gruber's failure to complete the required safety training by the set deadline (Ex. E to Salama Decl.); (2) August 5, 2020, e-mail correspondence from Salama to Gruber noting that "[t]he tooling cost from the ATC w[as] significantly higher ($40K vs. $15K) than [alternatives]" and asking "[w]hat causes this disconnect?" (Ex. H to Salama Decl.); (3) August 9, 2020, e-mail correspondence from Salama to Gruber asking to discuss the ATC tooling costs (Ex. I to Salama Decl.); (4) e-mail correspondence regarding Gruber's "significant priorities to focus on in the coming year" which adjusts Gruber's priorities and reassigns some of his prior assignments to other team members (Ex. K to Salama Decl., ECF No. 119-11); (5) an October 14, 2020, correspondence to Gruber detailing the "problems" with his performance, including notes about a "dysfunctional" paper purchasing process in place, the fact that the ATC "is losing money and [Salama] do[es not] believe there is a clear plan to improve it[s] profitability", and that "[s]afety has not improved" (Ex. L to Salama Decl.); (6) a document providing eleven reasons for terminating Gruber (Ex. M to Salama Decl., ECF No. 119-13); and (7) May 20, 2021, e-mail correspondence from Salama to the BOA confirming that Salama terminated Gruber because he has "been unable to rely on him to deliver the needed results[,] whether it is around safety practices, Texas start-up, paper profitability, automation efforts[,] and a needed manufacturing and engineering vision" (Ex. U to Salama Decl.). Gruber even admitted to Wheeler that he was not surprised that he was terminated "because he realized that . . . Salama was blaming him for the low profitability of the paperboard business and the delay of the start-up of the Texas Pulp Plant." (DSOF ¶ 42; PRSOF ¶ 42.)

These undisputed facts, supported by citations to the evidence identified by Defendant, show that Sabert terminated Gruber because he "neglect[ed] [his] duties."[12] Here, the Court finds that the undisputed facts show that Plaintiff was terminated for "Cause" because he "neglect[ed] [his] duties[.]" (*See, e.g.*, DSOF ¶¶ 13, 15, 18, 20-21, 24-25, 28, 32-35, 39; PRSOF ¶¶ 13, 15, 18, 20-21, 24-25, 28, 32-35, 39.) Moreover, Plaintiff failed to cite evidence in his response to Defendant's statement of facts from which a reasonable trier of fact could return a verdict in his favor. Plaintiff, therefore, is not entitled to any payout under the TBA. (*See* TBA § 4 ("If . . . employment with [Sabert] is terminated for Cause at any time, . . . then all rights to the incentive bonus are forfeited and this Agreement shall have no effect from and after the date of such termination. . . .").)

---

[12] Plaintiff argues that the "priorities" Defendant identified "were based on expectations that arose before the Covid-19 pandemic arrived in March of 2020." (Pl.'s Opp'n Br. 12.) As discussed above, however, the evidence shows that contemporaneous documents memorialize instances where Sabert found Gruber to be failing in his duties. Moreover, Plaintiff does not provide more than a self-serving declaration in opposition to dispute the facts articulated by Defendant related to Plaintiff's job performance, which is insufficient to show that there is a genuine dispute of material fact regarding Defendant's evaluations of Gruber's performance and/or Gruber's shortcomings in his role. *See, e.g.*, *Automec, Inc. v. STG Logistics, Inc.*, No. 24-728, 2025 WL 2506137, at *2 (D.N.J. Sep. 2, 2025) ("Self-serving, conclusory affidavits and testimony, when contradicted by other record evidence, are insufficient to create a genuine dispute of material fact." (citing *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011))). Additionally, Plaintiff spoliated relevant evidence in this matter, from which the Court would draw an adverse inference if Plaintiff had raised a genuine dispute such that the matter went to trial. (*See* Mem. Op. & Order on Mot. for Sanctions 11.)

## IV.    CONCLUSION

Based on the foregoing, the Court grants Defendant's motion and dismisses Plaintiff's Complaint for lack of standing.[13]

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: April 30th, 2026

_____

[13] "To maintain a declaratory judgment claim, a plaintiff must have an interest [in] the matter at hand." *UE Grp., LLC v. J & B Holding Co.*, No. 09-6088, 2010 WL 3937138, at *3 (D.N.J. Oct. 4, 2010) (citations omitted) (dismissing declaratory judgment action for lack of standing). Here, because Plaintiff is not entitled to a payout under the TBA, he has no interest in "whether Sabert can unilaterally buy out Gruber's bonus interest under the [TBA]." (*See* Mem. Op. 10.)